## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-02471-JLK

PAUL CURRY,

      Plaintiff,

v.

MILLERCOORS, INC.,

      Defendant,

_____

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
_____

      Plaintiff, Paul Curry, through undersigned counsel, hereby submits his Response in opposition to Defendant's Motion To Dismiss and respectfully requests that the Court deny Defendant's Motion.  As grounds therefore, Plaintiff states as follows;

### STATEMENT OF FACTS

      On March 31, 2009, Plaintiff injured his lower back while working at Defendant's Rocky Mountain Bottling Company ("RMBC") in Wheatridge, Colorado.  (Compl. ¶ 12.) While torqueing Flexco buckles with a ½ inch drill, Plaintiff strained his back and was forced to seek medical attention.  (Compl. ¶ 15.)  Plaintiff was originally prescribed Celebrex and Vicodin for this injury, but found medical marijuana to be a much more effective treatment with milder side effects.  (Compl. ¶ 17.)  Plaintiff uses medical marijuana only occasionally on an "as needed" basis to treat his conditions, such as when his back spasms or pain prevents Plaintiff from falling asleep.

On January 19, 2011, Defendant held a town hall meeting, at which the issue of medical marijuana was discussed.  (Compl. ¶ 18.)  Defendant espoused the position that medical marijuana patients were not prohibited from working for Defendant, but that medical marijuana patients would be required to fill out a form disclosing their medical marijuana patient status to Defendant.  (Compl. ¶ 19.)  Plaintiff was never provided with one of these disclosure forms and understood that the forms had not been generated at the time Plaintiff was discharged.

On February 16, 2011, while off duty and not on Defendant's property, Plaintiff suffered a back spasm and took medical marijuana to alleviate the symptoms of this spasm.  Plaintiff used medical marijuana from February 16, 2011 through February 18, 2011 to treat his back spasms.  Plaintiff did not work or enter onto Defendant's property during this time.  Plaintiff did not use medical marijuana again until after he was terminated on March 14, 2011.

On January 13, 2011, Defendant issued a revision of its Drug-Free workplace policy.  This revision included a provision addressing medical marijuana patients and their use of medical marijuana on Defendant's property.  The Drug-Free workplace policy states that "use of medical marijuana at work or on Company property, or being impaired on the job due to use of medical marijuana, is also prohibited."  However, this provision, as well as Plaintiff's understanding from the town-hall meeting, was that medical marijuana patients were allowed to remain employed by Defendant, so long as they were not under the influence of medical marijuana while at work during working hours.  At no point in Plaintiff's career at RMBC did Plaintiff ever use medical marijuana

2

at work, on company property, or come to work while impaired by medical marijuana or any other substance.[1]

On March 3, 2011, Plaintiff was told by Carroll Hessel, one of Plaintiff's superiors at RMBC, to help an independently contracted crane operator move a piece of machinery. (Compl. ¶ 21.)  When Plaintiff arrived to help, he realized that the crane operator was moving the machinery improperly.  Plaintiff tried to get the crane operator's attention by shouting and waving his arms and then stepping onto a railing and waiving and shouting for him to stop, but the machinery was damaged before the crane operator noticed Plaintiff.  (Compl. ¶ 21.)  While Plaintiff did not cause the accident and was unable to prevent the accident from occurring, Plaintiff was "involved" in the incident.  (Compl. ¶ 20.)

Therefore, Plaintiff was forced to undergo a drug-screen.  (Compl. ¶ 22.)  Plaintiff did not consent to the drug screen and felt that he was obligated to undergo the screen. Plaintiff took two drug screens on two separate occasions on March 3, 2011.  (Compl. ¶ 24.)  Plaintiff disclosed on both occasions that he was a medical marijuana patient even though he did not want to disclose his status as such to Defendant.  (Compl. ¶ 23.)  Both drug-screens came back "invalid."  (Compl. ¶ 24.)

On March 4, 2011, Plaintiff went to the Coors Medical Center and met with Dr. Smaldone who administered another drug screen.  (Compl. ¶ 24.)

---

[1] It should be noted that Defendant provides beer to its employees in the employee breakroom at RMBC.

On March 7, 2011, Plaintiff received an initial written warning regarding the disclosure of his status as a medical marijuana patient on March 3, 2011.  (Compl. ¶ 26.) Without any test results showing the presence of medical marijuana in his system, Plaintiff was reprimanded for not disclosing his status as a medical marijuana patient prior to March 3, 2011.  (Compl. ¶ 26.)   Plaintiff had not disclosed his status because he wanted to maintain the confidentiality of his status as a medical marijuana patient, and he was still waiting for the disclosure form that he understood from the January town hall meeting was forthcoming.

On March 10, 2011, the test results from Plaintiff's March 4, 2011 drug-screen came back positive for cannabinoids.  (Compl. ¶ 28.)  This result did not specify whether the cannabinoids found in Plaintiff's system were active or merely residual from Plaintiff's use of medical marijuana on February 18, 2011.

On March 14, 2011, Plaintiff was terminated for his apparent violation of Defendant's Drug-Free workplace policy.  (Compl. ¶ 29.)  The two portions of the Drug-Free workplace policy relevant to Plaintiff's termination refer to prescription medications and medical marijuana.  (Compl. ¶ 19.)  As for prescription medications, the Drug-Free workplace policy states that "when an employee is using a prescription drug as directed by the employee's physician, but the drug carries a warning that could impact the employee's ability to perform job duties (e.g. may cause drowsiness while operating an automobile or machinery or equipment), the employee must report this to Health Services or Human Resources, and approval to work may be withheld if it is determined that the situation presents a safety risk to the employee or others."

First, medical marijuana is not prescribed, but rather recommended.  Second, medical marijuana does not carry warnings regarding its impact on job performance ability.  Plaintiff was not taking any prescription drugs on March 3, 2011.

The Drug-Free workplace policy states that "use of medical marijuana at work or on Company property, or being impaired on the job due to use of medical marijuana, is also prohibited."  There is no written provision requiring the disclosure of medical marijuana patient status like there is for prescription drugs.  Plaintiff never used medical marijuana at work or on company property.  Furthermore, Plaintiff has never been impaired on the job due to use of medical marijuana.  While the third drug-screen, administered a full day after the incident, registered positive for marijuana, this was not active marijuana.  Furthermore, had the first two initial drug-screens worked properly, no active marijuana would have been found in Plaintiff's system because the last time Plaintiff medicated prior to March 3, 2011 was on February 18, 2011.

**1.**   **Plaintiff States A Claim Based On Disability Discrimination.**

   A.   Plaintiff Is Disabled

Plaintiff is a 57-year-old man who suffers from hepatitis C, osteoarthritis, and pain and muscle spasms caused by a work-related back injury.  Plaintiff sees physicians regularly with regard to these conditions, and has used various prescriptions, recommendations, and physical therapy regimens to treat the chronic and disabling symptoms of these conditions.

Under Colorado law, "disability" means "a physical impairment which substantially limits one or more of a person's major life activities and includes a record of

such an impairment and being regarded as having such an impairment."  C.R.S. § 24-34-301 (2.5).

The Colorado Constitution, Article XVIII section 14 further defines "debilitating medical condition" as follows:

> "[a] *chronic* or *debilitating* disease or medical condition, or treatment for such conditions, which produces, for a specific patient, one or more of the following, and for which, in the professional opinion of the patient's physician, such condition or conditions reasonably may be alleviated by the medical use of marijuana: cachexia; *severe* pain; *severe* nausea; seizures, including those that are characteristic of epilepsy; or persistent muscle spasms…"

Colo. Consti. Art. 18 § 14(1)(a)(II) (emphasis added).

Plaintiff's disabilities fit both of these definitions under Colorado law. Furthermore, the Hepatitis C, arthritis, as well as the pain and muscle spasms from his back injury substantially limit major life activities for Plaintiff.

### i.   *Chronic Hepatitis C*

Plaintiff has suffered from chronic hepatitis C for over five years.  In 2002, Plaintiff began to seek medical treatment for liver problems he was experiencing.  (Ex. A)  Since 2002, Plaintiff has regularly seen physicians with regard to his chronic hepatitis C.  (Ex. B)  Plaintiff still continues to seek treatment for hepatitis C.

The development of hepatitis C has substantially affected Plaintiff's life activities, especially his ability to eat and drink certain foods and beverages, including but not limited to alcohol.  Until October 24, 2002, Plaintiff consumed alcohol regularly. However, after discussing the negative effects of alcohol on various organs with his doctor, Janina Czartolomna, Plaintiff began to discontinue his alcohol consumption.  (Ex.

C)  As his hepatitis C progressed, Plaintiff has been forced to discontinue drinking alcohol altogether due to the strain on his liver.

Defendant was aware that Plaintiff had a history of hepatitis C on April 6, 2009 when Plaintiff sought medical treatment at the Coors Occupational Medicine Center for a back injury.  (Ex. D)  After examining Plaintiff, Dr. Susan Morrison wrote in her report that Plaintiff "does have a history of hepatitis C."

### ii.      Pre-Rheumatoid Osteoarthritis

Plaintiff suffers from osteoarthritis.  This condition has developed over the years with symptoms consistent with pre-rheumatoid arthritis.  Since 2002, Plaintiff has experienced worsening arthritic symptoms in his hands and fingers.  (Ex. E)  Plaintiff's family has a history of severe rheumatoid arthritis.  (Ex. C)  The symptoms of Plaintiff's arthritis are stiffness and pain in his hands.  At times, this pain and stiffness substantially limits Plaintiff's ability to use his hands.  Plaintiff continues to seek treatment for his osteoarthritis and continues to monitor the development of rheumatoid arthritis.

### iii.     Back Injury

On March 31, 2009, Plaintiff injured his back while working for Defendant. Plaintiff began to experience back pain so severe that it prevented him from sleeping. After a week of enduring this pain, Plaintiff saw Dr. Susan Morrison on April 6, 2009 at the Coors Occupational Medicine Center.  After examining Plaintiff, Dr. Morrison order Plaintiff to restrict his "stooping, bending, twisting, pushing, [and] pulling," as well as take Flexiril and hydrocodone.

Plaintiff met Dr. Philip Smaldone at the Coors Occupational Medicine Center for a follow-up examination on April 9, 2009.  After examining Plaintiff, Dr. Smaldone ordered Plaintiff to take Celebrex and Vicodin, as well as authorized Plaintiff to return to work with several movement-related restrictions.  (Ex. F)  Plaintiff continues to experience recurrent back pain as a result of this injury, and he continues to limit his bending, twisting, and stooping.  These restrictions have substantially impacted Plaintiff's ability to engage in any strenuous activities.

Plaintiff uses medical marijuana judiciously and manages his medical condition closely.  Plaintiff uses a variety of different remedies to treat the symptoms of his conditions.  For instance, medical marijuana immediately and temporarily relieves Plaintiff's pain when he has a severe case of muscle cramps, pain, or spasms caused by his arthritis or prior back injury.  However, the physical therapy that Plaintiff performs helps minimize the frequency of muscle cramps, pain, and spasms, thereby, lessening the amount of medical marijuana Plaintiff needs to use to treat his debilitating medical conditions

## 2.    **Plaintiff's Discharge Was Wrongful and Discriminatory**

Defendant discriminated against Plaintiff when it discharged him for testing positive for marijuana in violation of its drug-free workplace policy.  At the time of his discharge, Defendant was aware of Plaintiff's status as a medical marijuana patient.  Plaintiff uses medical marijuana to treat his debilitating medical conditions.  By discharging Plaintiff for using medical marijuana, Defendant discharged Plaintiff for

treating his medical conditions.  Therefore, Defendant discharged Plaintiff with regard to his disability.

Defendant also discriminated against Plaintiff by discharging Plaintiff for engaging in lawful off-duty activities.  The medical use of marijuana is legal under Colorado State law.  Under Colorado law, a person in possession of a medical marijuana registry card is immune from the state's criminal laws with regard to certain marijuana-related offenses.  Plaintiff was in possession of a medical marijuana registry card at the time of his discharge.  Therefore, under Colorado law, Plaintiff's use of marijuana was legal.  Defendant discharged Plaintiff for engaging in this legal activity during non-working hours.  Therefore, Defendant discriminated against Plaintiff.

A.    <u>Wrongful Discharge</u>

Plaintiff's termination for violating Defendant drug-free workplace policy is discriminatory wrongful discharge.  C.R.S. § 24-34-401(1)(a) states that;

> "[i]t shall be a discriminatory or unfair employment practice [f]or an employer to… to discharge… any person otherwise qualified because of disability… but, with regard to a disability, it is not a discriminatory or an unfair employment practice [to discharge a person] if there is no reasonable accommodation that the employer can make with regard to the disability, the disability actually disqualifies the person from the job, and the disability has a significant impact on the job."

C.R.S. § 24-34-401(1)(a).

Defendant discharged Plaintiff, who was otherwise qualified to perform his job because of the treatment that Plaintiff was using to manage the symptoms of his disabling medical conditions.  Plaintiff did not require any accommodation for this treatment

because he only used medical marijuana off-duty and his disability, as well as the treatment of his disability, did not have a significant impact on his job.

Defendant cites the Colorado Appeals Court case of *Beinor v. Industrial Claim Appeals Office* as rationale for why Plaintiff's discharge was not discriminatory. However, *Beinor* specifically addresses the use of medical marijuana in the context of unemployment benefits.  The *Beinor* court clarifies that "[it is] not deciding whether the amendment limits an employer from discharging an employee for using medical marijuana."  Beinor v. Industrial Claim Appeals Office, DD No.1 0948-2010 (Colo. App. August 18, 2011)

While Colo. Consti. Art. 18 § 14(10)(b) states, "[n]othing in this section shall require any employer to accommodate the medical use of marijuana in any work place," there are no allegations, and Plaintiff denies, that he ever used or was impaired by medical marijuana in the workplace.  Colo. Consti. Art. 18 § 14(10)(b).  Judge Gabriel's dissent in *Beinor* explains that Colo. Consti. Art. 18 § 14(10)(b) is;

> "clear and unambiguous and refer[s] solely to the acquisition, possession, production, use, or transportation of medical marijuana, or paraphernalia related to it, *in the workplace.* I do not believe that these provisions encompass the presence of marijuana in one's blood after the lawful use of medical marijuana at home. In particular, I am not persuaded that the presence of medical marijuana in one's blood amounts to either "use," which I believe connotes contemporaneous consumption, or "possession"… If it did, then under a zero-tolerance policy like that at issue here, many patients who are eligible to use medical marijuana would likely abandon their right to do so, because even lawful use at home would put their benefits, and perhaps even their jobs, at risk. I do not believe that the voters who passed the medical marijuana amendment intended section 14(10)(b) to sweep that broadly. *Cf.* § 24-34-402.5, C.R.S. 2010 (providing that, subject to certain exceptions, it is a discriminatory or unfair employment practice for an employer to terminate the employment of an employee for

engaging in lawful activity off the premises of the employer during nonworking hours)."

Beinor, DD No.1 0948-2010 (2011). *Dissenting Opinion* (emphasis added).

Plaintiff never acquired, possessed, produced, used, or transported marijuana while at work for Defendant or during working hours. Plaintiff merely "possessed" residual cannabinoids in his bloodstream. This trace amount of cannabinoids had no effect on Plaintiff's attention, learning, or job performance. Furthermore, Plaintiff was never impaired by medical marijuana at any time during working hours while working for Defendant. Plaintiff refused to abandon his right to use medical marijuana legally during non-working hours to treat his disabling conditions, and Defendant wrongfully discharged him.

B.    Lawful Off-Duty Activity

Defendant alleges that Plaintiff tested positive for an illegal substance. However, the substance that Plaintiff tested positive for, cannabinoids, is legal for qualified medical marijuana patients under Colorado law. Under Colorado law, it is discriminatory for an employer to discharge an employee for engaging in lawful off-duty activities. Plaintiff was fired for engaging in a lawful off-duty activity.

The Colorado Constitution creates an exception to Colorado's criminal marijuana laws, not just an affirmative defense for violation of those laws. Colo. Consti. Art. 18 § 14(2)(b) states that "[e]ffective June 1, 1999, it shall be an *exception from the state's criminal laws* for any patient… in lawful possession of a registry identification card to engage or assist in the medical use of marijuana." Colo. Consti. Art. 18 §

14(2)(b)(emphasis added).  Therefore, Colorado's criminal laws, with regard to marijuana, do not apply to a registered medical marijuana patient, thereby making the conduct legal.  Colo. Consti. Art. 18 § 14(2)(b).

Justice Gabriel's dissent in *Beinor* further clarifies the legality of medical marijuana under Colorado law;

> "'Legalize' means '[t]o make lawful; to authorize or justify by legal sanction.'  Accordingly, in my view, the medical marijuana amendment was intended not merely to create a defense to a charge of marijuana possession or use, but rather to make medical marijuana possession and use legal under the conditions identified in the amendment."

> Beinor, DD No.1 0948-2010 (2011) *quoting* Black's Law Dictionary 977 (9th ed. 2009); *accord* Webster's Third New International Dictionary 1290 (2002) (defining "legalize" to mean "to make legal: give legal validity or sanction to").

C.R.S. § 24-34-402.5(1) states that "[i]t shall be a discriminatory or unfair employment practice for an employer to terminate the employment of *any* employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours unless such a restriction… relates to a bona fide occupational requirement or is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer."  C.R.S. § 24-34-402.5(1) (emphasis added).  "Any" means "all."  Kauntz v. HCA-Healthone, LLC, 174 P.3d 813, 817 (Colo. App. 2007); Gwin v. Chesrown Chevrolet, 931 P.2d 466 (Colo.App. 1996) (affirming jury award under CRS § 24-34-402.5 for claim that defendant car dealership invaded employee's

privacy rights by terminating him because of lawful activity he engaged in on his own time away from dealership).

Defendant discharged Plaintiff because he tested positive for cannabinoids. Plaintiff had cannabinoids in his bloodstream because he lawfully used medical marijuana during non-working hours.  Furthermore, Defendant has presented no evidence that Plaintiff's off-duty use of medical marijuana relates to a bona fide occupational requirement or that Plaintiff was impaired by marijuana during working hours. Defendant discriminated against Plaintiff for lawfully treating his chronic debilitating medical conditions during non-working hours.

**3.** **Defendant' Medical Marijuana Disclosure Policy Violates Plaintiff's Rights**

Medical patients have a right to keep their personal medical information confidential.  Medical marijuana patients have enhanced confidentiality protections because the Colorado Constitution explicitly provides that information about medical marijuana patients, including but not limited to one's status as a medical marijuana patient, are to remain confidential.

Defendant's drug-free workplace policy requires employees who are medical marijuana patients to disclose their confidential medical marijuana patient status and make this information public to Defendant officials.  Plaintiff was officially reprimanded for not disclosing his confidential medical marijuana patient status.  Defendant's medical marijuana disclosure policy is discriminatory, unconstitutional, and tortious.

A.    Defendant's Medical Marijuana Disclosure Policy Is Discriminatory

Defendant discriminated against Plaintiff when it inquired as to Plaintiff's disability and his treatment of those disabilities.  Furthermore, Defendant discriminated against Plaintiff when it reprimanded him for not disclosing his confidential medical marijuana patient status.

C.R.S. § 24-34-401(1)(d) states that "[i]t shall be a discriminatory or unfair employment practice [f]or any employer… to print or circulate… any statement, advertisement, or publication… or to make any inquiry in connection with… membership that expresses, either directly or indirectly, any… specification… as to disability… or intent to make any such… specification… unless based upon a bona fide occupational qualification."

C.R.S. § 24-34-401(1)(d).

On January 19, 2011, Defendant made statements at a town hall meeting and distributed its drug-free workplace policy.  This policy expresses specification as to disability.  Specifically, medical marijuana patients, who incidentally use medical marijuana to treat debilitating medical conditions, are specified and required to perform actions that other employees are not required to perform.  Furthermore, there is no bona fide occupational qualification requiring medical marijuana patients to disclose their patient status.

For years, Plaintiff treated the symptoms of his debilitating medical conditions with light exercise, herbal supplements, and prescription medications.  However, on February 19, 2010, Plaintiff's physician recommended that Plaintiff use medical marijuana to treat his symptoms.  Plaintiff found that medical marijuana effectively

treated his symptoms on an as-needed basis, and he continued to use it until February 18, 2011.  The reason that Plaintiff stopped using medical marijuana was because on January 19, 2011, Plaintiff was notified that, as a medical marijuana patient, he was required to disclose his patient status to Defendant.  While Plaintiff found that using medical marijuana alleviated his pain, nausea, and muscle spasms, he did not want to disclose his confidential medical marijuana patient status to his employer.

On March 7, 2011, Plaintiff received a written warning from Defendant because "[Plaintiff] had not reported [his medical marijuana] usage to the medical center."  (Ex. G).  By requiring Plaintiff to disclose his medical marijuana patient status and then reprimanding Plaintiff when he failed to do so, Defendant discriminated against Plaintiff.

B.     Defendant's Medical Marijuana Disclosure Policy Is Unconstitutional

The Colorado Constitution protects the confidentiality of all medical marijuana registrant information, including one's status as a medical marijuana patient.  The Colorado Constitution states that "[t]he state health agency shall create and maintain a confidential registry of patients who have applied for and are entitled to receive a registry identification card" and that "[n]o person shall be permitted to gain access to any information about patients in the state health agency's confidential registry… except for authorized employees of the state health agency in the course of their official duties and authorized employees of state or local law enforcement agencies."  Colo. Consti. Art. XVIII § 14(3)(a).

Defendant's medical marijuana disclosure policy allows Defendant to gain access to information about patients in the state health agency's confidential registry, namely their status as medical marijuana patients.  By forcing Plaintiff to waive his right to the confidentiality of his medical marijuana patient status, Defendant gained access to Plaintiff's confidential medical marijuana patient information and violated Plaintiff's constitutional right to keep his medical marijuana status confidential.

C.R.S. 18-18-406.3 provides in section (5) that;

> "[a]ny person … who releases or *makes public*… any confidential information contained in any such record that is provided to or by the marijuana registry of the department without the written authorization of the marijuana registry patient commits a class 1 misdemeanor."

C.R.S. 18-18-406.3(5).

Defendant made public Plaintiff's confidential information that is provided by the medical marijuana registry without Plaintiff's written authorization when it forced Plaintiff to disclose his medical marijuana status.  By forcing employees to disclose their status as medical marijuana patients, Defendant makes public confidential information that is contained on medical marijuana registry cards that are provided by the marijuana registry.

D.   Defendant's Medical Marijuana Disclosure Policy Is Tortious

Defendant's inquiry into its employee's confidential medical marijuana information constitutes the tort of intrusion upon seclusion for the improper appropriation of private information.

Health records are considered confidential, and information contained in such records cannot be released or disclosed without a patient's consent and authorization. Doe v. High-Tech Inst., Inc., 972 P.2d 1060, 1068 (Colo.App. 1998) See Division of Medical Quality v. Gherardini, 93 Cal. App.3d 669, 156 Cal.Rptr. 55, (1979) (recognizing a right of privacy in one's medical records). Furthermore, there is a generally recognized privacy interest in one's own body. Personal information concerning a person's health may be obtained through one's blood, saliva, and other bodily products, such products cannot be extracted from a person or initially tested without either consent or proper authorization. Doe, 972 P.2d at 1068; See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

Invasion of privacy by intrusion does not depend upon any publicity, or communication to the public generally, nor does it require a physical intrusion. Doe, 972 P.2d at 1070; Restatement (Second) of Torts § 652B cmt. a (1977). The gist of the tort is interference with an individual's solitude, seclusion, or private affairs and concerns. id. cmt. b. The intrusion into the plaintiff's privacy requires intentional rather than merely reckless conduct. Fire Ins. Exch. v. Sullivan, 224 P.3d 348 (Colo.App. 2009), cert. denied (2010).

Defendant intentionally interfered with Plaintiff's private affairs and concerns when it required him to disclose his private and confidential medical marijuana patient status. Defendant did not request that Plaintiff consent to waive his right to keep his medical marijuana status confidential. Rather, Defendant issued Plaintiff a written

warning for not reporting his confidential medical marijuana status to the MillerCoors Medical Center.

Furthermore, Plaintiff never consented to the first two mouth swab tests that were administered on March 3, 2011.  Defendant states that "[w]hen Defendant security presented the [mouth swab] test to Plaintiff, Plaintiff became defensive, sarcastic, and excited… The security officer observed that Plaintiff tried to keep the swab in the center of his mouth and not swab the mouth and tongue.  The security officer had to remind Plaintiff to swab."

The security officer who administered the mouth swab states in his incident report that "I advised Subject Curry the first test would be an i Screen oral fluid drug screen test, which seemed to upset Subject Curry very much.  He was very defensive, sarcastic, and excited about the test." (Defendant's Mot. To Dismiss, Ex. C).  Furthermore, while the Security officer's incident report thoroughly details all of the events preceding, during, and after Plaintiff's drug test, the officer fails to state that Plaintiff was asked for or gave consent for Defendant to collect saliva samples from his mouth.

Defendant intentionally interfered with Plaintiff's privacy when it took saliva samples from him without his consent.  Defendant also intentionally interfered with Plaintiff's privacy when it required Plaintiff to disclose his confidential medical marijuana patient status.  These invasions of privacy angered and humiliated Plaintiff and ultimately caused him to lose his job and suffer economic and emotional damages.

Defendant cites *Slaughter v. John Elway Dodge Southwest/Autonation* in its attempt to show that its intrusion into the seclusion of Plaintiff's medical use of

marijuana during non-working hours was warranted. However in *Slaughter*, the plaintiff used marijuana for illegal recreational purposes, and her actions were not protected by the Colorado Constitution or Revised Statutes.  Slaughter v. John Elway Dodge Southwest/Autonation, 107 P.3d 1165 (Colo. App. 2005).  In the present case, Plaintiff's actions were completely legal under Colorado Constitution Art. XVIII § 14 and C.R.S. § 18-18-406.3 and, therefore, Plaintiff qualifies for the protections of C.R.S. § 24-34-402.5(1).[2]

**4.   The Federal CSA's Prohibition of Marijuana Is Unconstitutional And Unreasonable**

Defendant does not contest that Plaintiff's use of medical marijuana was lawful under Colorado state law.  However, Defendant relies on the federal prohibition of marijuana to establish that Plaintiff's use of medical marijuana during non-working hours

---

[2] For further elaboration on the legality of medical marijuana under Colorado and Federal law, *see also*  Colorado Constitution, Article XVIII § 14(2)(d) (constitutional right to the medical use of marijuana includes "acquisition, possession, manufacture, production, sale, distribution, dispensing, or transportation of marijuana"); In re Marriage of Parr, 240 P.3d 509, 511 (Colo. App. 2010) (discussing "father's *constitutional right to use medical marijuana*" throughout Court of Appeals' opinion); 21 U.S.C. § 903 (no Congressional intent "to occupy the field" on subject matter of controlled substances "which would otherwise be within the authority of the State"); 21 U.S.C. § 885(d); CFR § 1301.24 (federal immunity for state or local government official "who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances"); C.R.S. § 12-43.3-901 (deputizing Center licensees and employees as badged state and local government officials empowered to confiscate fraudulent documentation and pursue all violations of State law); U.S. Patent No. 6,630,507 (patent held by United States of America, as represented by the Department of Health and Human Services, for the use of cannabinoids for medical purposes); National Institute of Drug Abuse, Compassionate Use Protocol (federal program growing, transporting, and distributing marijuana to U.S. citizens throughout the states for medical purposes); District of Columbia Medical Marijuana Program, D.C. Stat. § 7-1671 et seq.; D.C. Law 13-315; 57 DCR 3360 (federal medical marijuana program passed by U.S. Congress and signed into law by President of the United States).

was illegal, and therefore Plaintiff's claim under C.R.S. § 24-34-402.5(1) should be dismissed.  However, the federal prohibition of marijuana violates the fundamental substantive due process right to bodily integrity, violates the constitutional right to receive information by contracting the available sphere of knowledge, and the classification of marijuana as a schedule I substance is an unreasonable legislative classification. Therefore, Plaintiff's claims should not be dismissed due to the current Federal prohibition of marijuana.

A.    The CSA Violates The Fundamental Right To Bodily Integrity

The Fourteenth Amendment of the U.S. Constitution guarantees the right to bodily integrity.  The Federal Controlled Substances Act ("CSA") infringes upon this fundamental right by mandating preventative medical treatment upon individuals without their informed consent.  The CSA's primary purpose is to prevent drug abuse.  Drug abuse is a disease.  The CSA's preventative treatment of drug abuse violates Plaintiff's fundamental right to free from unwanted medical treatment and should not preclude Plaintiff from having his claims heard.

i.    The Right to Bodily Integrity is Fundamental

"In ascertaining whether a right is fundamental, a court must determine whether the right is "explicitly or implicitly guaranteed by the Constitution." NORML v. Bell, 488 F.Supp. 123, 133 (D.D.C. 1980); see also San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33-34 (1973).

The right to be free from unwanted medical attention "is deeply rooted in this Nation's traditions... and has long been 'firmly entrenched in American tort law' and is

securely grounded in the earliest common law." Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 306 (1990). *see also* Mills v. Rogers, 457 U.S. 291, 294 n.4 (1982).  State Supreme Courts across America have affirmed that "each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of lifesaving surgery, or other medical treatment." Natanson v. Kline, 186 Kan. 393, 406-407 (1960).  "The inviolability of the person" has been held as "sacred" and "carefully guarded" as any common-law right." Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 305 (1990); *see also* Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251-252 (1891).  Thus, freedom from unwanted medical attention is unquestionably among those principles "so rooted in the traditions and conscience of our people as to be ranked as fundamental." id.; *see also* Snyder v. Massachusetts, 291 U.S. 97, 105 (1934).

*ii.     Drug Abuse Is A Disease.*

Drug abuse and addiction is a complex disease of the brain that results from recurring drug intoxication and is affected by genetic, developmental, experiential, and environmental factors.  The Supreme Court has long recognized that narcotic addicts, as well as alcoholics, are "diseased and proper subjects for [medical] treatment." Robinson v. California, 370 U.S. 660, 667 (U.S. 1962).  In Robinson, Justice Stewart emphasized that criminalization of narcotic addiction was unconstitutional; "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." id.

The National Institute on Drug Abuse states that "many people… view drug abuse and addiction as strictly a social problem and may characterize those who take drugs as morally weak.  One very common belief is that drug abusers should be able to just stop

taking drugs if they are only willing to change their behavior.  What people often underestimate is the complexity of drug addiction—that it is a *disease* that impacts the brain and because of that, stopping drug abuse is not simply a matter of willpower."[3]

      *iii.*    *The Federal CSA Constitutes Medical Treatment Of Drug Abuse.*

The primary objectives of the CSA are to "*conquer drug abuse* and to control the legitimate and illegitimate traffic in controlled drugs."  Gonzales v. Raich, 545 U.S. 1, 12 (2005) (emphasis added).  In the CSA, Congress established five "schedules" of "controlled drugs."  id. at 13 *see also* 21 U.S.C. § 802(6).  Controlled drugs are placed on a particular schedule based on their *potential for abuse*, their accepted medical use in treatment, and the *physical and psychological consequences of abuse of the drug*.  id. at 14 *see also* 21 U.S.C. § 812(b) (emphasis added).

Marijuana is classified as a Schedule I controlled drug.  21 U.S.C. § 812(c), Sched. I(c)(10).  For a drug to be designated a Schedule I controlled drug, it must be found:  (1) that the drug "has a *high potential for abuse*";  (2) that the drug "has no currently accepted medical use in treatment in the United States";  and (3) that "[t]here is a lack of accepted safety for use of the drug or other drug under medical supervision."  21 U.S.C. § 812(b)(1).

The Comprehensive *Drug Abuse Prevention* and Control Act of 1970 consists of three titles; Title I relates to the prevention and treatment of narcotic addicts through the

---

[3] NIDA InfoFacts: Understanding Drug Abuse and Addiction, NIDA, http://www.nida.nih.gov/infofacts/understand.html (last visited July 26, 2012). (emphasis added)

Department of Health and Human Services; Title II addresses drug control and enforcement as administered by the Attorney General and the DEA.  Title III concerns the import and export of controlled drugs.  Gonzales, 545 U.S. at 12, *Fn*. 19.  The DEA was created by Executive Order in 1973 to provide a single unified command for the Federal Government in "fighting the war on drug abuse."[4]

It is clear that the primary goal of the CSA is to prevent drug abuse.  The DEA and DOJ effectuate this primary goal of the CSA through criminal investigations, prosecutions, and civil forfeitures.  Not only does this qualify as the unlicensed practice of medicine, the DEA's enforcement of the CSA constitutes mandatory preventative medical treatment in violation of the fundamental right to be free from unwanted medical treatment.

The term "medical treatment" is ambiguous and is nowhere defined in the CSA. However, the 9th Circuit found that the following definition of "medical treatment" was reasonable; "The management of illness, by the use of drugs, dieting, or *other means* designed to bring relief or *effectuate a cure*."  Franceschi v. American Motorists Ins. Co., 852 F.2d 1217, 1220 (9th Cir. 1988); *citing* Funk & Wagnalls New Comprehensive International Dictionary of the English Language (1980) (emphasis added).  The primary purpose of the CSA is to conquer the illness of drug abuse, in other words, effectuate a cure of drug abuse.  Therefore, the CSA constitutes medical treatment.

---

[4] Richard Nixon, Message to the Congress Transmitting Reorganization Plan 2 of 1973 Establishing the Drug Enforcement Administration, March 28, 1973.

Colorado statutes define the practice of medicine as "holding out one's self to the public within this state as being able to diagnose, *treat…* or *prevent* <u>*any*</u> human *disease…* or physical or mental condition… by… <u>*any*</u> physical, mechanical, *or other means whatsoever;"* C.R.S. 12-36-106(1) (2010) (emphasis added). The Federal Government, through myriad agencies, have held themselves out to the people of the State of Colorado as being able to prevent drug abuse through enforcement of criminal laws. Plaintiff has not consented to this preventative medical treatment, and the mandatory enforcement of this medical treatment, thereby, violates Plaintiff's fundamental right to bodily integrity.

When a statute or law significantly interferes with the exercise of a fundamental right, "it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." <u>Zablocki v. Redhail</u>, 434 U.S. 374, 388 (1978). The government has no interest banning a plant that has no reported fatalities, is not physically addictive, provides myriad health, spiritual, and intellectual benefits, and is widely accepted in modern American culture.

The Supreme Court has recognized a liberty interest in bodily integrity where individuals are subject to *dangerous* or *invasive* procedures where their *personal liberty is being restrained.* <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006); *see*, e.g., <u>Rochin v. California</u>, 342 U.S. 165 (1952) (determining that a detainee's bodily integrity was violated when police ordered doctors to pump his stomach to obtain evidence of drugs); <u>Screws v. United States</u>, 325 U.S. 91 (1945) (holding that an individual's bodily integrity was violated where a citizen was beaten to death while in police custody). Plaintiff's personal liberty is significantly restrained when his employer can dictate the

24

lawful activities in which Plaintiff may engage in his own home during non-working hours.

      *iv.    Consent*

Under Colorado law, a doctor has a duty to obtain a patient's informed consent before performing medical treatment, which involves informing the patient of any substantial risks of the procedure.  Bloskas v. Murray, 646 P.2d 907, 912-13 (Colo.1982). When law enforcement agencies and officers with no medical training attempt to prevent the disease of drug abuse, they not only practice medicine without a license, but also do not disclose the substantial risks associated with this form of preventative treatment.

The substantial risks of preventing drug abuse through law enforcement action and criminal prosecution are numerous and include;

      a.    possible injury and/or death at the hands of officers;

      b.    destruction and/or seizure of personal property, including violent entry into private residences with battering rams, flash-bang grenades, and military-style assault weapons;

      c.    humiliation and embarrassment through arrest and prosecution;

      d.    social limitations and restrictions, as well as loss of liberty, due to felony conviction;

      e.    substantial taxpayer costs due to law enforcement expenditures and prison construction;

      f.    diversion of law enforcement resources from violent crimes and crimes that have cognizable victims;

      g.    creation of lucrative black market for prohibited substances, including marijuana;

h.      mass incarceration of non-violent drug offenders to the point that the United States of America has more prisoners per-capita than any other country in the world;

i.      over 50,000 deaths on the United States/Mexico border due to American demand for prohibited substances and Mexican military crackdown on substance manufacturers and distributors;

Even in 1974, the Supreme Court of Colorado recognized several of the

substantial risks that the continued preventative treatment of drug abuse, specifically of

marijuana, has on the citizens, officials and resources of this state;

A felony is the most serious of crimes; a felony conviction can result in the loss of liberty and the rights enjoyed by other citizens. The integrity--and obedience--of the laws of this state, moreover, rest, in the final analysis, on the consent of the People. They cannot consent to that which they do not believe to be true, nor can they believe what has been disproven in the scientific laboratories of this country. Police conduct aimed at the thousands of persons involved in the use and dispensing of marijuana, furthermore, has often given way to overzealous police practices which endanger the right of privacy. Then, too, we are all too well aware of the heavy burden that the court and prison officials must bear to process the numerous felonies which this law precipitates. These considerations cannot be slighted by continued legislative inactivity.

People v. Summit, 183 Colo. 421, 428, 517 P.2d 850, 854 (Colo. 1974); See, e.g., People v. Weisenberger, 516 P.2d 1128 (announced December 17, 1973).

When a statute or law significantly interferes with the exercise of a fundamental

right, "it cannot be upheld unless it is supported by sufficiently important state interests

and is closely tailored to effectuate only those interests." Zablocki v. Redhail, 434 U.S.

374, 388 (1978).  While the government has an interest in preventing drug abuse, just like

it has an interest in preventing alcoholism or nicotine addiction through use of

educational programs rather than criminal penalties, the mandatory application of

preventative treatment of this disease violates Plaintiff's right to be free from unwanted medical treatment.

      B.      <u>The First Amendment Includes The Right To Receive Information And Marijuana Imparts Chemical Information To The User</u>

The U.S. Constitution prohibits the Federal government from interfering with the minds and thoughts of its citizens. The First Amendment declares that individuals have the freedom, with very few limitations, to express their thoughts and opinions. The First Amendment necessarily protects thoughts as well. The United States Supreme Court has proclaimed that individuals are bestowed with the fundamental right to receive information and ideas. The Federal prohibition of marijuana violates this fundamental right and should not preclude Plaintiff's claims.

      *i.*      *Controlled Substances Impart Chemical Information To Individuals*

Individuals receive unique chemical information when certain chemicals and substances are introduced into their brains. These substances trigger a chain reaction of neurological functions that result in enhanced thoughts, perceptions, and sensations. When marijuana is consumed, its active ingredient, Delta-9-tetrahydrocannabinol, attaches to cannabinoid receptors on nerve cells in the brain, affecting the way those cells work. "Cannabinoid receptors are abundant in parts of the brain that regulate movement, coordination, *learning and memory*, *higher cognitive functions such as judgment, and pleasure*." <u>National Institute on Drug Abuse, Report Series: Marijuana Abuse</u>, Pub. No. 10-3859 (2010). "Along with euphoria, relaxation is another frequently reported effect in

human studies. Marijuana's effects also include "heightened sensory perception (e.g., brighter colors), laughter, altered perception of time, and increased appetite."  id.

### ii. The First Amendment Protects The Receipt Of Thoughts, Sensations, And Perceptions

The right to exercise freedom of speech is one of the most fundamental rights bestowed by the U.S. Constitution.  Freedom of thought necessarily predicates freedom of speech.  In 1928, Justice Brandeis stated that "the makers of our Constitution… sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations" because "[t]hey recognized the significance of man's spiritual nature, of his feelings and of his intellect."  Olmstead v. United States, 277 U.S. 438, 478 (1928).  The CSA's prohibition of distribution and possession of a plant that causes individuals to experience sensations and emotions such as euphoria and laughter violates the fundamental tenets of the First Amendment.

The Supreme Court has recognized the right to receive information, necessary for the development of thoughts, ideas, and, ultimately speech, as a fundamental right, enshrined in the First Amendment.  "[The] freedom [of speech and press] . . . necessarily protects the right to receive . . . ."  Martin v. City of Struthers, 319 U.S. 141, 143 (1943); see also Griswold v. Connecticut, 381 U.S. 479, 482 (1965); Lamont v. Postmaster General, 381 U.S. 301, 307-308 (1965); Pierce v. Society of Sisters, 268 U.S. 510 (1925). The right to "receive information and ideas, regardless of their social worth, is fundamental to our free society."  Winters v. New York, 333 U.S. 507, 510 (1948)

In <u>Stanley v. Georgia</u>, an individual was convicted of possessing obscene videos in his own home in violation of Georgia's anti-obscenity laws.  <u>Stanley v. Georgia</u>, 394 US 557 (1969).  The U.S. Supreme Court lambasted the State of Georgia for even propounding such a constitutionally violative statute and declared, "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds."  <u>id.</u> at 565.  Justice Marshall further scorned, "in the face of these traditional notions of individual liberty, Georgia asserts the right to protect the individual's mind from the effects of obscenity… [w]hatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts."  <u>id.</u>

However, the CSA's prohibition of marijuana is premised on the desirability of preventing individuals from experiencing the euphoria, relaxation, heightened sensory perception, altered perception of time, and other affects of marijuana.  The "right to receive" recognized in *Stanley* is "not a right to the existence of modes of distribution of obscenity which the State could destroy without *serious risk of infringing on the privacy of a man's thoughts*."  <u>United States v. Reidel</u>, 402 U.S. 351, 360, 91 S.Ct. 1410, 1419 (1971); *see also* <u>West Virginia State Board of Education v. Barnette</u>, 319 U.S. 624, 642 (1943).  The CSA seriously infringes upon Plaintiff's private thoughts and ideas because the CSA does not allow for any distribution of marijuana, nor consumption of marijuana, thereby banning the unique thoughts, ideas, emotions, and sensations imparted to the individual when consuming marijuana.  The prohibition of distribution and private

consumption of marijuana is no more constitutional than a prohibition of the distribution and private consumption of adult magazines.

Just like many of the substances prohibited by the CSA, obscene images have a high potential for addiction and abuse because viewing sexually arousing images releases a large amount of neurochemicals.  Viewing these images releases dopamine and norepinephrine, neurochemicals that focus attention and enhance memory, as well as oxytocin, a neurochemical that is released when people hold hands or kiss.

Similarly, the THC molecule, received into the brain through consuming marijuana, binds to specific cannabinoid receptors in the brain.  The cerebral cortex contains a high concentration of cannabinoid receptors, especially in areas responsible for sensory perception (touch, sight, hearing, taste, and smell).  This is why marijuana effects thinking, problem solving, sensory perception, movement, balance, and memory.

Marijuana and other substances under the Federal CSA qualify for First Amendment protection.  "[T]he basic principles of freedom of speech . . . do not vary" with a new and different communication medium.  Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 503 (1952).  The most basic principle—that government lacks the power to restrict expression because of its message, ideas, subject matter, or content is subject to a few limited exceptions for historically unprotected speech.  Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002).  However, the legislature "cannot create new categories of unprotected speech simply by weighing the value of a particular category against its social costs and then punishing it if it fails the test."  Brown v. Entertainment

Merchants Association, U.S. S. Ct. No. 08–1448., Decided June 27, 2011; *see also*

United States v. Stevens, 559 U.S. ___, 130 S.Ct. 1577 (2010).

*iii.*     *The CSA Does Not Pass Strict Scrutiny*

The CSA attempts to completely restrict the ability to receive information through

consumption of marijuana.  The blanket prohibition of the receipt of unique chemical

information obtained exclusively through the consumption of marijuana violates the right

to freedom of thought and speech.  Therefore, the CSA is invalid unless it can be shown

that it is justified by a compelling government interest and is narrowly drawn to serve

that interest.  R. A. V. v. St. Paul, 505 U. S. 377, 395 (1992).  The primary interest

supporting the CSA is the prevention of a disease through enforcement of mandatory

criminal laws and civil forfeitures.  This violates substantive due process and is not a

compelling government interest.

Furthermore, the blanket prohibition of substances under Schedule I of the CSA is

not narrowly tailored to prevent substance abuse.  The CSA obliterates a plethora of

legitimate uses of Schedule I controlled substances in its attempt to prevent drug abuse.

Marijuana has a long history of medical and spiritual use, as well as influencing the

thoughts and ideas of artists, writers, scientists, musicians, philosophers, and countless

other individuals of all ethnicities, ages, and social statuses.

The government offends the spirit of the First Amendment when it "contract[s] the

spectrum of available knowledge" by restricting the right to receive information and to

exercise the freedom of inquiry, the freedom of thought.  Griswold v. Connecticut, 381

U.S. 479**,** 482 (1965); *see also* Martin v. Struthers, 319 U.S. 141, 143 (1943); Wieman v.

Updegraff, 344 U.S. 183, 195 (1952)(Justice Frankfurter and Douglas concurring). By enforcing a blanket prohibition on the manufacture, sale, and use of marijuana, the government prohibits individuals from experiencing the unique thoughts, sensations, and perspectives obtained exclusively through consumption of marijuana.

The First Amendment is not a shield that protects conduct that is clearly a violation of a valid criminal statute. However, the CSA is not a valid criminal statute because it constitutes a violation of the First Amendment right to receive information as well as an unconstitutional infringement upon the fundamental right to bodily integrity.

C.     Lack of Schedule I Qualification

The classification of marijuana as a schedule I substance is an unreasonable legislative classification because marijuana has many accepted and safe medical uses in Colorado and the United States.

In order to qualify as a schedule I substance under the UCSA, a substance must;

(1) have a high potential for abuse;

(2) have no currently accepted medical use in treatment in the United States; and

(3) lack accepted safety for use of the drug or other substance under medical supervision.

C.R.S. § 18-18-203(1)(a)-(c).

In 2001, Colorado voters amended the Colorado Constitution to allow for the medical use of marijuana. Colo. Consti. Art. XVIII § 14. In 2010, the Colorado Legislature enacted the "Colorado Medical Marijuana Code" in order to regulate the cultivation, manufacture, distribution, and sale of medical marijuana. C.R.S. 18-18-

406.3.  Furthermore, 17 states now have a medical marijuana program to allow patients with debilitating conditions, such as cancer, glaucoma, HIV/AIDS, and myriad other conditions, to treat the symptoms of their conditions.  Clearly, in 2012, there are currently accepted medical uses in treatment for marijuana in Colorado and the United States.  Furthermore, patients can safely use marijuana through ingestion of edibles or through vaporization under medical supervision.  The use of marijuana is so safe that medical use does not require physician supervision and no reported deaths have ever been attributed solely to overdose of marijuana.

In 1974, the Colorado Supreme Court "reluctantly" declared that classification of marijuana as a dangerous or hallucinogenic substance was a reasonable legislative classification.  Summit, 517 P.2d 850 at 851.  In 2012, 38 years after the *Summit* holding and after over 10 years of medical marijuana in the State of Colorado, the classification of marijuana as a substance with no accepted medical use or safe means of administration can no longer be considered a reasonable legislative classification.

**5.    Conclusion**

Plaintiff lawfully uses medical marijuana during non-working hours to treat the symptoms of his debilitating medical conditions.  Due to the polarizing nature of medical marijuana, Plaintiff wished to assert his to constitutional right to maintain the confidentiality of his status as a medical marijuana patient.  Furthermore, Plaintiff's use of medical marijuana during non-working hours is lawful and has no impact on his ability to safely perform his job.

Defendant discriminated against Plaintiff's disabilities by discharging him for using medical marijuana.  Defendant discriminated against Plaintiff by discharging him for engaging in a lawful off-duty activity.  Defendant also discriminated against Plaintiff, and violated his constitutional rights, by requiring him to disclose his confidential medical marijuana patient status.

<strong><u>PRAYER FOR RELIEF</u></strong>

Wherefore, Plaintiff respectfully requests that the Court deny Defendant's Motion To Dismiss, and for all other just and proper relief.

Dated this 15th day of October, 2012                  Respectfully Submitted,


                                                                             */s/ Travis B. Simpson*
                                                                             Travis B. Simpson

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve a copy via email upon the following:


William A. Wright
wwright@shermanhoward.com


/s/ Travis B. Simpson
Travis B. Simpson